812 F.2d 63
 Fed. Sec. L. Rep. P 93,136
Jeffrey W. HERRMANN and Linda J. Herrmann, on Behalf of WALT
DISNEY PRODUCTIONS, Plaintiffs-Appellees, Cross-Appellants,
v.
Saul P. STEINBERG, Reliance Group Holdings, Inc., a Delaware
corporation, and Reliance Insurance Company, A
Pennsylvania corporation,
Defendants-Appellants, Cross-Appellees.
 Nos. 78, 241, Dockets 86-7368, 86-7404.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 30, 1986.
Decided Feb. 18, 1987.
 
 1
 Gary R. Goldman, Hartsdale, N.Y. (Goldman & Fleisher, P.C., Hartsdale, N.Y., on the brief), for plaintiffs-appellees and cross-appellants.
 
 
 2
 Lewis A. Kaplan, New York City (Paul, Weiss, Rifkind, Wharton & Garrison, Blair C. Fensterstock, New York City, on the brief), for defendants-appellants and cross-appellees.
 
 
 3
 Before KEARSE and ALTIMARI, Circuit Judges, and STEWART, District Judge.*
 
 STEWART, District Judge:
 
 4
 The cross-appeals before us concern a new variable in the calculation of short swing profit subject to section 16(b) of the Securities and Exchange Act of 1934, 15 U.S.C. Sec. 78p(b) (1985). "For the purpose of preventing the unfair use of [inside] information," section 16(b) dictates that profit realized by a corporate insider on any purchase and sale (or sale and purchase) of securities completed within a six month period is recoverable by the issuer. 15 U.S.C. 78p(b) (1985). The class of statutory insiders governed by section 16(b) is composed of directors, officers, and beneficial owners, the latter defined as any owner of 10% of the issuer's stock both before the purchase and at the time of sale. Foremost-McKesson, Inc. v. Provident Securities Co., 423 U.S. 232, 249-50, 96 S.Ct. 508, 518-19, 46 L.Ed.2d 464 (1976); Reliance Electric Co. v. Emerson Electric Co., 404 U.S. 418, 419-20, 92 S.Ct. 596, 597-98, 30 L.Ed.2d 575 (1972). In this case the defendants' liability derives from beneficial ownership.
 
 
 5
 Plaintiffs Jeffrey W. Herrmann and Linda J. Herrmann ("the Herrmanns") are stockholders who brought this action on behalf of Walt Disney Productions Corporation ("Disney") to recover profit realized on the sale of 100 Disney shares bought and sold within a six month period by defendants Saul P. Steinberg, Reliance Group Holdings, Inc., and Reliance Insurance Company (referred to collectively herein as "Reliance").[1] Reliance conceded below that it is liable under section 16(b) to Disney for short swing profits realized on the 100 shares. Both parties appeal the District Court's calculation of these profits.
 
 BACKGROUND
 
 6
 Reliance began to acquire large amounts of Disney stock beginning in March 1984. By early May 1984, Reliance had become a beneficial owner of more than 10% of Disney's outstanding common stock, bringing Reliance within the ambit of section 16(b).[2] Reliance purchased an additional 100 shares of Disney stock on June 1, 1984, paying $6,460 ($64.50 per share, plus $10 in brokerage commissions). In its June 8, 1984 13D statement filed with the Securities and Exchange Commission--and in letters delivered that day to Disney's directors--Reliance announced its intention to take over Disney through a tender offer for additional Disney shares sufficient to increase its holdings to at least 49%. Reliance also reiterated its previously stated intention to seek the removal of Disney's directors through a proxy contest.
 
 
 7
 At some point, presumably before its June 8 announcement, Reliance formed a new corporation to carry out its tender offer. The new corporation required total financing of $1,525,000,000. Loan commitments were obtained by Reliance's investment bankers, Drexel Burnham Lambert Incorporated ("Drexel"), from various sources, and Reliance paid these sources fees in proportion to their various commitments. In addition, Reliance compensated Drexel for its financial services. Other costs incurred in anticipation of the tender offer included public relations, legal, and proxy solicitation expenses.
 
 
 8
 On the evening of June 8--the same day that Reliance announced its tender offer--Disney offered to buy back all of its stock held by Reliance. After some negotiating, the parties entered into an agreement on June 11, 1984, in which Reliance agreed to cancel its inchoate tender offer and sell its 4,198,333 shares of Disney stock for $297,367,926.40 ("purchase price"). In addition to the purchase price, Disney paid Reliance $28 million as reimbursement for expenses incurred in preparing for the aborted tender offer. Apparently, this $28 million was also rendered in part to reimburse Reliance for actual purchases of shares, as discussed below.
 
 
 9
 How to factor this $28 million into the calculation of Reliance's short swing profit is the central issue on appeal.
 
 
 10
 The district court found that the expenses reimbursed had been incurred by Reliance for its own benefit and thus were not "incidental" to the sale.[3] The court stated that the transaction fell within a blanket rule that tender offer expenses are not deductible from short swing profit. Accordingly, the district court added the $28 million to the purchase price, arriving at a per share sale price of $77.50 per share. Multiplying this $77.50 by one hundred and subtracting from that amount the $6,460 paid by Reliance for the 100 shares, the court calculated that Reliance had realized $1,290 in short swing profit. A judgment in this amount was entered for the plaintiffs.
 
 
 11
 The Herrmanns assert that the $28 million (which they call a "greenmail kicker") should be considered profit solely on the 100 share transaction, and that the court below erred in assigning only a pro rata share of the $28 million to the purchase price of the 100 shares. The Herrmanns admit that it is difficult to ascertain exactly what Disney received in consideration for its $28 million. In the face of this uncertainty, they assert that the district court should have awarded all of the $28 million to Disney as short swing profit, erring on the side of maximum penalty for Reliance's excursion into "greenmail."
 
 
 12
 Reliance contends that the district court erred in ignoring the legal consequences of its conclusion that the $28 million was reimbursement for the abandoned tender offer. Reliance argues that short swing profit does not include payments made to reimburse a party for takeover expenses unless those expenses were incurred in the purchase and sale of stock violative of section 16(b). Since the proposed tender offer had nothing to do with the 100 shares subject to section 16(b), Reliance reasons, the tender offer did not help it realize illicit short swing profits.
 
 
 13
 We hold that the district court erred in its treatment of the $28 million. The district court did not find a sufficient connection between the $28 million and the purchase and sale of the shares subject to 16(b) to justify its inclusion of the $28 million in the calculation of short swing profits. However, when the district court examines on remand the role of the $28 million in the Disney-Reliance transaction, such a connection may be revealed. We vacate the judgment and remand for further fact finding on the question of damages.
 
 DISCUSSION
 
 14
 We begin by breaking down the expenses "reimbursed" by Disney's $28 million payment into two types: expenses incurred in the actual purchase of shares and those incurred in the preparation of the abandoned tender offer. We are unpersuaded by Reliance's argument that the district court found that the $28 million reflects only reimbursement for tender offer expenses. The ruling was on a motion for summary judgment made by the plaintiffs, and the court was compelled to view the facts in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc., --- U.S. ----, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59, 90 S.Ct. 1598, 1608-09, 26 L.Ed.2d 142 (1970). Thus, for the purpose of ruling on plaintiff's motion, it accepted Reliance's characterization of the $28 million. The court's reasoning--that any reimbursement for takeover expenses should be included in the calculation of short swing profit--made it unnecessary for the court to distinguish between the types of expenses being reimbursed.
 
 
 15
 The evidence suggests that some of the $28 million was intended as reimbursement for expenses incurred in the actual purchase of shares. The June 11, 1984 agreement between Disney and Reliance describes the $28 million as "reimbursement of ... estimated out-of-pocket costs and expenses incurred in connection with its actual and contemplated purchases of Shares." (Emphasis added.) Howard Steinberg, the senior vice president and general counsel of Reliance Group Holdings, gives a similar description of the $28 million in his July 22, 1985 affidavit. At oral argument, Reliance's counsel agreed that the record does not preclude the possibility that part of the $28 million was reimbursement for expenses related to some purchases of stock, but said that such expenses were de minimis and not related to the section 16(b) shares.
 
 
 16
 Non-incidental expenses incurred in purchasing section 16(b) stock are not deductible from short swing profits. Texas International Airlines v. National Airlines, Inc., 714 F.2d 533, 541 (5th Cir.1983), cert. denied, 465 U.S. 1052, 104 S.Ct. 1326, 79 L.Ed.2d 721 (1984); Reece Corp. v. Walco National Corp., 565 F.Supp. 158, 166 (S.D.N.Y.1983); Lane Bryant, Inc. v. Hatleigh Corp., 517 F.Supp. 1196, 1202 (S.D.N.Y.1981); Oliff v. Exchange International Corp., 449 F.Supp. 1277, 1302 (N.D.Ill.1978), aff'd, 669 F.2d 1162 (7th Cir.1980), cert. denied, 450 U.S. 915, 101 S.Ct. 1358, 67 L.Ed.2d 340 (1981). We will describe how to include such expenses in the calculation of Reliance's short swing profits after discussing the proper treatment of the remaining portion of the $28 million: that portion that was reimbursement for expenses incurred in the abandoned tender offer ("tender offer reimbursement").
 
 
 17
 The district court apparently assumed that the tender offer reimbursement should be included in the short swing profits realized by Reliance because of the types of expenses being reimbursed. "[T]ender offer expenses that an unsuccessful bidder incurs for its own benefit, such as commitment fees, investment banking fees, public relations fees, and legal fees, are not deductible expenses" (citations omitted). However, the cases cited by the district court in support of this proposition concern expenses that were incurred in buying the stocks that were subject to section 16(b). It was this close connection between the takeover expenses reimbursed and the purchase and sale violative of section 16(b) that was dispositive in Texas International Airlines v. National Airlines, Inc., 714 F.2d at 540-42 and Lane Bryant, Inc. v. Hatleigh Corp., 517 F.Supp. at 1202. Cf. Morales v. Lukens, Inc., 593 F.Supp. 1209, 1215 (S.D.N.Y.1984). Such a connection is not present in this case, where the money spent by Reliance on the abandoned tender offer did not yield a single share.
 
 
 18
 Yet it would be simplistic to divorce the abandoned tender offer completely from Disney's purchase of Reliance's holdings and hence from the realization of short swing profit that resulted from that purchase. A more realistic picture of the transaction is revealed when the focus is shifted from the nature of the expenses reimbursed to what Disney received in return for its money. Disney's objective in entering into negotiations with Reliance was to ward off its takeover threat. Success depended on neutralizing the two components of that threat: Reliance's substantial holdings of Disney stock and its announced tender offer. Reliance and Disney structured their agreement to make it appear that all Disney received in consideration for the $28 million was the end of one component of the takeover threat, i.e., the tender offer. However, this discrete treatment has an appearance of artificiality. When the relationship between the tender offer and Reliance's substantial stock holdings are examined on remand, the district court may determine that some portion of the $28 million was paid by Disney as consideration for Reliance's sale of its Disney shares.
 
 
 19
 While the record before us is incomplete, it is at least possible that Disney would not have paid $28 million to end Reliance's tender offer if Reliance had not also agreed to sell its Disney holdings. From Disney's standpoint, the takeover threat would not have disappeared if Reliance had agreed solely to withdraw its tender offer. Reliance could still have purchased Disney stock by other means, or it could have sold its entire block of shares to another suitor. On the other hand, it would make little sense for Reliance to go forward with a tender offer after having just sold its Disney holdings, amounting to approximately 11% of Disney's outstanding stock, to its takeover target. For these reasons, the district court may decide to attribute at least some portion of the tender offer reimbursement to Reliance's agreement to sell the company its shares.
 
 
 20
 On remand, the finder of fact must determine what portion of the tender offer reimbursement (if any) was paid by Disney as consideration for Reliance's sale of its Disney shares. This amount can be calculated by subtracting from $28 million the amount that Disney would have paid Reliance to withdraw the tender offer if Reliance had not also agreed to sell its substantial stock holdings. While the determination of this amount must await resolution at trial, it appears unlikely that Disney would ascribe no value to ending the tender offer. Disney's offer to negotiate appears to have come only after the tender offer announcement, suggesting that Reliance's sizable stock position alone was insufficient to bring Disney to the bargaining table. Moreover, ending the immediate tender offer threat--even for a short period--would have given Disney valuable time to prepare defenses to a takeover.
 
 CONCLUSION
 
 21
 The decision of the district court is vacated and the case is remanded.[4] On remand, the district court should add to the $297,367,926.40 purchase price paid by Disney: 1) any part of the $28 million that was reimbursement for expenses incurred in the actual purchase of shares[5] and 2) that portion of the $28 million that was paid in consideration for Reliance's sale of its Disney holdings. As it did below, the district court should divide this amount by the total number of Disney shares sold by Reliance to Disney, resulting in a per-share purchase price. Multiplying this amount by 100 and subtracting the $6,460 that Reliance paid for the 100 shares subject to 16(b) will yield the short swing profit to be disgorged by Reliance.[6]
 
 
 
 *
 Honorable Charles E. Stewart, Jr., Senior District Judge, Southern District of New York, sitting by designation
 
 
 [1]
 Through his stock ownership--and that of his family--Steinberg controls both Reliance Group Holdings and Reliance Insurance
 
 
 [2]
 The plaintiffs in this case do not dispute that the May 1, 1984 purchase of 1,000,000 shares that pushed Reliance over the 10% ownership threshold was a single block trade. Therefore, for the purposes of this case the only shares subject to section 16(b) are the 100 shares purchased after the May 1 transaction
 
 
 [3]
 Expenses that are attendant to any purchase of shares and routinely included in the purchase price, such as transfer taxes and brokerage commissions, are considered incidental to the sale and thus deductible from short swing profits. Texas International Airlines v. National Airlines, Inc., 714 F.2d 533, 542 (5th Cir.1983), cert. denied, 465 U.S. 1052, 104 S.Ct. 1326, 79 L.Ed.2d 721 (1984). In this case the district court correctly found that the $10 brokerage commission was an incidental expense
 
 
 [4]
 As a threshold matter on remand, plaintiffs must establish that they have been Disney shareholders throughout this litigation. Plaintiffs' general allegations of stock ownership below were insufficient to establish this prerequisite. Lewis v. McAdam, 762 F.2d 800, 804 (9th Cir.1985); Portnoy v. Kawecki Berylco Industries, 607 F.2d 765, 767 (7th Cir.1979); Rothenberg v. United Brands Co., [1977-78 Transfer Binder] Fed.Sec.L.Rep. (CCH) p 96045 (S.D.N.Y.), aff'd mem., 573 F.2d 1295 (2d Cir.1977)
 
 
 [5]
 If the district court finds that a specific portion of the $28 million can be traced to expenses incurred in the purchase of the 100 shares subject to 16(b), then Reliance's short swing profits should be calculated as follows. A per-share purchase price would first be calculated from the sum of the aggregate purchase price ($297,367,926.40) and that portion of the $28 million paid in consideration for Reliance's sale of its Disney holdings. Once the per- share price is multiplied by 100, the amount should be added to the portion of the $28 million that is attributable specifically to the expenses incurred in the purchase of the 100 shares subject to 16(b). Subtracting $6,460 from that amount will yield the short swing profit to be disgorged by Reliance
 
 
 [6]
 Any part of the $28 million that the district court finds was paid solely in consideration for Reliance's agreement to call off its proposed tender offer should of course be excluded from this calculation of short swing profits