**INVESTORS INSURANCE COMPANY OF AMERICA, Plaintiff–Appellant, Cross–Appellee,**

v.

**DORINCO REINSURANCE COMPANY, Defendant–Appellee, Cross–Appellant.**

Nos. 213, 366, Dockets 90–7396, 90–7432.

United States Court of Appeals, Second Circuit.

Argued Sept. 17, 1990.

Decided Oct. 24, 1990.

Before OAKES, Chief Judge, MESKILL, Circuit Judge, and RESTANI, Judge.[*]

OAKES, Chief Judge:

Investors Insurance Company of America ("Investors") appeals from a judgment of the United States District Court for the Southern District of New York, Shirley Wohl Kram, *Judge*, granting summary judgment in favor of Dorinco Reinsurance Corporation ("Dorinco") on Investors' breach of contract and reformation claims. 736 F.Supp. 1260. Dorinco cross-appeals from the District Court's refusal to impose sanctions on Investors pursuant to Rule 11 of the Federal Rules of Civil Procedure. For the reasons set forth below, we affirm both of the District Court's rulings.

### FACTS

1. Investors' Appeal.

In October 1986, Dorinco agreed to sell its wholly-owned subsidiary, the Dorinco Syndicate Corporation (the "Dorinco Syndicate"), to Investors, for a price of $2,908,-395. The Dorinco Syndicate was a member of the now-defunct New York Insurance Exchange (the "Exchange"), an insurance market created in 1978 to facilitate the underwriting of reinsurance and certain direct insurance agreements. By purchasing

---

[*] The Honorable Jane A. Restani, of the United States Court of International Trade, sitting by

designation.

the Dorinco Syndicate, Investors also acquired a seat on the Exchange.

The facts giving rise to this dispute center around the New York Insurance Exchange Security Fund, Inc. (the "Security Fund"), a not-for-profit corporation established pursuant to the Exchange's Constitution (the "Constitution") to assist in the detection and prevention of insolvencies among the members of the Exchange. The assets of the Security Fund were derived from two separate accounts, a "Surcharge Fund" and a "Deposit Fund." The Surcharge Fund was made up of charges levied on policyholding customers of the members of the Exchange; the Deposit Fund, by contrast, was funded by mandatory $500,000 contributions from each of the Exchange's members. The Board of Directors of the Security Fund was authorized to draw down and use monies from the Deposit Fund only upon a finding that the Surcharge Fund "is, or is likely to be, insufficient to satisfy the obligations of the Security Fund." Unless and until the monies from the Deposit Fund were drawn down, the contributions remained the property of the individual members of the Exchange and could not be used by the Security Fund.

On September 2, 1987, the Board of Directors of the Security Fund determined that the Surcharge Fund was inadequate to satisfy the Security Fund's obligations, and therefore called down the Deposit Fund pursuant to the procedures set forth in the Constitution. Shortly thereafter, Investors made a demand on Dorinco for payment of the $500,000 that the Dorinco Syndicate had contributed to the Deposit Fund. Investors claimed that Dorinco was obligated to make such a payment pursuant to section 6.06 of the Investors–Dorinco purchase agreement (the "Agreement"), which provides that:

> Dorinco agrees to indemnify Investors for a certain proportion of the insolvencies of syndicates on the Exchange that result in diminution of the Security Fund.

Dorinco, arguing that the indemnification clause did not apply to the draw down from the Deposit Fund, refused to indemnify Investors, and Investors brought suit.

In the court below, Investors argued that Dorinco's failure to provide indemnification constituted a breach of contract, because the indemnification clause of the Agreement was intended to cover the draw down of funds from the Deposit Fund to the Security Fund, regardless of whether that transfer resulted in a disbursement of monies from the Security Fund itself. Its theory was that the Agreement contemplated a "dollar-for-dollar exchange of assets," and that requiring Investors to absorb the loss of the Dorinco Syndicate's $500,000 contribution to the Deposit Fund would frustrate that purpose. In the alternative, Investors argued, if the Agreement did not apply to the draw down of monies from the Deposit Fund, Investors was entitled to reform the Agreement on the ground that the contract as written was based on a mutual mistake.

Both Investors and Dorinco moved for summary judgment. In support of its motion, Investors offered the deposition and affidavit of William H. Browne, an Investors director, who testified that the purchase price for the Dorinco Syndicate was intended to represent the exact market value of the Dorinco Syndicate's assets, and that the parties structured the indemnification clause to ensure that Investors would not be forced to pay additional amounts after the transaction was completed. Based on this testimony, Investors argued that the provisions of the indemnification clause were triggered when the Security Fund called down the monies from the Deposit Fund, because this action resulted in Investors' loss of the Dorinco Syndicate's $500,000 contribution. In response, Dorinco offered the declaration of Frank A. Petitti, the president of Dorinco, who testified that the parties intended the indemnification clause to apply only when the Security Fund's aggregate accounts were depleted as a result of insolvencies on the Exchange.

The district court, finding that the plain meaning of the indemnification clause required Dorinco to indemnify Investors only if the assets of the Security Fund were actually diminished, rejected Investors'

breach of contract claim. Citing the parol evidence rule, it held that Investors was precluded from offering extrinsic evidence of the parties' intent in order to vary the Agreement's terms. In addition, the court found that Investors had failed to meet its "heightened burden" of establishing a mutual mistake, because the evidence Investors offered "provide[d] a questionable basis for finding mistake on behalf of [Investors] and no viable basis to rebut [Dorinco's] allegation" that the indemnity agreement as written accurately reflected Dorinco's intent.[1]

### 2. Dorinco's Cross–Appeal.

On October 27, 1988, Dorinco made an offer of judgment to Investors pursuant to Rule 68 of the Federal Rules of Civil Procedure. In its letter to Investors, Dorinco noted that the offer was "between the parties," and that, under Rule 68, it was "not admissible in Court except in a proceeding to determine costs." Investors never replied to Dorinco's offer, and the offer was therefore deemed withdrawn. *See* Fed.R. Civ.P. 68 (providing that offers of judgment not accepted within ten days will be considered withdrawn). Thereafter, in the papers supporting its summary judgment motion, Investors disclosed the existence and amount of Dorinco's unaccepted offer.

Dorinco argued below that Investors' disclosure of the unaccepted offer of judgment was improper, and requested the district court to impose Rule 11 sanctions on Investors. The district court denied Dorinco's request, and noted that it "ha[d] not considered this improper mention of a settlement proposal" in deciding the case. Dorinco has cross-appealed from this ruling, and argues that the court erred in assuming that improper disclosures are sanctionable only when they prejudice the opposing party.

### DISCUSSION

#### 1. Breach of Contract Claim.

■ The indemnification clause of the Agreement provides that Dorinco will in-

demnify Investors for a proportion of insolvencies on the Exchange "that result in diminution of the Security Fund." To prevail on its claim that the Agreement obligates Dorinco to indemnify Investors for draw downs of the Deposit Fund, then, Investors must establish that the phrase "diminution of the Security Fund" encompasses the Security Fund's drawing down of assets from the Deposit Fund, even before those assets are actually expended. We conclude that the language of the indemnification clause does not permit such an interpretation, especially in light of the limitation on the obligation to indemnify only for diminutions of the Security Fund occurring on or prior to December 31, 1988.

Preliminarily, we note a problem with the central assumption underlying Investors' claims, *i.e.*, that the Investors–Dorinco transaction contemplated a "dollar-for-dollar exchange of assets." Investors contends that the $2,908,395 purchase price paid for the Dorinco Syndicate reflected the total market value of the Dorinco Syndicate at the time of purchase, and that the parties' intent to effectuate a "dollar-for-dollar exchange" would therefore be frustrated by requiring Investors to absorb the loss of the Dorinco Syndicate's $500,000 contribution to the Deposit Fund. In support of this theory, Investors argues that the $2,908,395 purchase price equalled the aggregate value of two U.S. Treasury Notes that the Dorinco Syndicate held, and that the Treasury Notes constituted the Dorinco Syndicate's total assets at the time of the transaction. However, Investors' calculations ignore the fact that, by purchasing the Dorinco Syndicate, Investors obtained a seat on the Exchange, which itself had a significant value. Indeed, Investors acknowledges that it decided to purchase the Dorinco Syndicate in part to obtain a seat on the Exchange "in a less costly fashion than forming a 'new' syndicate company and seeking a 'new' seat on

---

**1.** The court also dismissed Investors' unilateral mistake claim, based on Investors' failure to include specific allegations of fraud or misrepresentation in its complaint. Investors has not appealed from this ruling.

the Exchange." Brief for Appellant at 15.[2] Because the combined value of the Treasury Notes and the seat on the Exchange was in excess of the $2,908,395 purchase price, we are skeptical of Investors' contention that the transaction with Dorinco was intended as a "dollar-for-dollar exchange."

■ Regardless of the merits of Investors' "dollar-for-dollar exchange" theory, however, the district court correctly found that Dorinco's failure to indemnify Investors for the September 1987 draw down from the Deposit Fund did not constitute a breach of contract. By its express terms, the Agreement requires Dorinco to reimburse Investors only if the total assets of the Security Fund are diminished as a result of insolvencies on the Exchange. According to the parol evidence rule, Investors is precluded from introducing extrinsic evidence of the contract's purpose in order to vary the plain meaning of the writing. *See Gerard v. Almouli,* 746 F.2d 936, 939 (2d Cir.1984) (barring parol evidence "to increase [a party's] obligations" where those obligations were "explicitly outline[d]" in the contract itself); *see also Wallace Steel, Inc. v. Ingersoll–Rand Co.,* 739 F.2d 112, 115 (2d Cir.1984); *Braten v. Bankers Trust Co.,* 60 N.Y.2d 155, 161, 468 N.Y.S.2d 861, 864, 456 N.E.2d 802, 805 (1983).[3] This conclusion is particularly appropriate given the Agreement's "integration clause," which provides that the Agreement represents the entire understanding of the parties to the transaction.

■ Investors' contention that parol evidence may be admitted to "explain" the meaning of the indemnification clause is unpersuasive. Parol evidence may be admitted to explain a writing only when the terms of the writing itself are ambiguous. *See Hanam, B.V. v. Kittay,* 589 F.Supp. 1042, 1047 (S.D.N.Y.1984) ("Parol may not be used to create an ambiguity where none exists."). Investors argues that the contract is ambiguous because the Security Fund is technically a corporation, and a corporation cannot be "diminished." An ordinary reading of the Agreement, however, would indicate that the "Security Fund" was merely a shorthand reference to the *assets* of the Security Fund, and not a reference to the corporation itself. As such, the indemnification clause is unambiguous, and there is no need for parol to explain the meaning of its terms. *See Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.,* 906 F.2d 884, 889 (2d Cir.1990).

*Rock Transport Properties Corp. v. Hartford Fire Ins. Co.,* 312 F.Supp. 341 (S.D.N.Y.), *aff'd,* 433 F.2d 152 (2d Cir.1970), and *In re National Basketball Assoc.,* 630 F.Supp. 136, 140 (S.D.N.Y.1986), which Investors cites for the proposition that contract interpretation should effectuate the document's "overall purpose," are inapplicable to the present case. In *Rock Transport,* the court relied on a provision in the contract itself that expressly stated the purpose of the parties' agreement. *See* 312 F.Supp. at 346 (noting an "unequivocal manifestation of purpose"). Likewise, in *National Basketball,* the contract itself explicitly provided that the parties would not do anything "to serve the purpose of defeating or circumventing the intention of the parties." 630 F.Supp. at 137. At no point in either case did the court look beyond the four corners of the documents to contradict the terms of the written agreements themselves.

Investors' alternative breach of contract argument is that, even if the indemnification clause applies only when the assets of the Security Fund are diminished, the draw down from the Deposit Fund would still trigger indemnification because "there is no doubt that the entire Deposit Fund drawn down by the Security Fund, Inc. *will be disbursed.*" Brief for Appellant at 38 (emphasis added). The plain language of the Agreement, however, refers to a "diminution" in the Security Fund; it does not

---

**2.** Capital requirements for new syndicates formed after July 1, 1985, were increased from $3,550,000 to $5,000,000 and the minimum policyholder surplus to be maintained from $2,200,000 to $3,000,000. Thus it was attractive to purchase a syndicate formed before July 1, 1985, as the Dorinco Syndicate was, because the seat on the Exchange was available at less risk.

**3.** Under the Agreement, New York law is controlling.

require indemnification merely because the Security Fund is likely to be diminished at some later date.[4] Accordingly, Investors has failed to establish that the conditions precedent to Dorinco's obligations under the indemnification clause have been met.

### 2. *Reformation Claim.*

■■ Investors' attempt to reform the Agreement is based on the theory that both Investors and Dorinco intended the indemnification clause to cover draw downs of the Deposit Fund, and that the language limiting indemnification to "diminution[s] of the Security Fund" was therefore a mutual mistake. Investors correctly notes that a contract can be reformed on the basis of mutual mistake if the writing does not accurately reflect the mutual intention of the parties, *see, e.g., John Hancock Mut. Life Ins. Co. v. Carolina Power & Light Co.,* 717 F.2d 664, 671 (2d Cir.1983), and that parol evidence is admissible to establish the existence of the mutual mistake, *see, e.g., Chimart Assocs. v. Paul,* 66 N.Y.2d 570, 573, 498 N.Y.S.2d 344, 347, 489 N.E.2d 231, 234 (1986). Under New York law, however, there is a "heavy presumption" that a written agreement accurately reflects the true intention of the parties, *see id.* at 574, 498 N.Y.S.2d at 347, 489 N.E.2d at 234, and the evidence of mutual mistake upon which Investors relies fails to overcome this presumption of validity.

In order to establish the existence of a mutual mistake, Investors must prove that *both* parties to the purchase agreement intended that the indemnification clause would apply to a draw down from the Deposit Fund. As evidence of its own intent, Investors relies on the testimony of William H. Browne, an Investors director, who stated that he intended the Investors–Dorinco transaction to represent a "dollar-for-dollar exchange of assets." Browne's testimony, however, provides only limited evidence of Investors' intent, as Browne was not a primary participant in the negotiations between Investors and Dorinco. In-

deed, in his deposition, Browne admitted that he had missed a number of meetings during the Investors–Dorinco negotiations, and that he could not remember which meetings he had attended.

More importantly, even if Browne's testimony established a mistaken belief on the part of Investors, Investors offered no evidence whatsoever that Dorinco was similarly mistaken as to the meaning of the indemnification clause. Furthermore, Dorinco's evidence suggested that the indemnification clause accurately reflected Dorinco's intent, and that it was the product of extensive negotiations between Investors and Dorinco. For example, Dorinco was obligated to indemnify Investors "only for insolvencies of members of the Exchange which are members as of the Closing Date" of the Agreement. Investors' conclusory allegation that Dorinco was mistaken as to the meaning of the indemnification clause is insufficient to refute Dorinco's evidence that the indemnification clause was accurate as written.

To be sure, the language of Article XIII § 4A of the Constitution, insofar as it says that "except as it may be utilized ... or called upon" the deposit remains the property of the depositor, implies that an initial depositor to the Deposit Fund loses all equity interest in that portion of its initial deposit when the Security Fund calls upon it, even prior to the point at which the Security Fund makes any expenditures. As such, it is difficult to understand why Investors did not insist on an indemnification clause that required indemnification as soon as the Dorinco Syndicate's $500,000 contribution to the Deposit Fund was drawn down. The fact that the indemnification agreement seems unrealistic from the standpoint of Investors, however, at most suggests that *Investors* may have been mistaken as to the meaning of the clause. It in no way satisfies Investors' heavy burden of establishing that Dorinco was similarly mistaken as to the situations

---

**4.** This does not of course take away from the proposition that the Security Fund under the Exchange Constitution Article XIII § 7A could draw down the Deposit Fund when the Sur-

charge Fund was found to be or "likely to be" insufficient to satisfy the Security Fund's obligations.

in which the indemnification provisions would apply.

■ Investors' final claim is that the district court based its award of summary judgment on an impermissible weighing of the credibility of the parties' witnesses. However, the court did not find that the testimony offered by Dorinco was more credible than that offered by Investors; rather, it found that Investors failed to offer any evidence at all of Dorinco's mistaken belief. Under these circumstances, the granting of summary judgment was entirely appropriate. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (finding that summary judgment is required where the non moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case").[5]

### 3. *Rule 11 Claim.*

■ Dorinco's request that Investors be sanctioned for including in its summary judgment papers an improper reference to Dorinco's offer of judgment rests on a novel interpretation of the scope of Rule 11. The theory, in essence, is that any mention of inadmissible evidence becomes a sanctionable offense merely because the evidence is referred to in the course of making a motion or pleading. We decline to extend the parameters of Rule 11 to such an unprecedented degree.

Rule 11 sanctions are appropriate when "pleading[s], motion[s], or other paper[s]" are "interposed for any improper purpose." Fed.R.Civ.P. 11. As we recently held, a court shall impose Rule 11 sanctions when:

> (1) a reasonable inquiry into the basis for a pleading has not been made; (2) under existing precedents there is no chance of success; and (3) no reasonable argument has been advanced to extend, modify or reverse the law as it stands.

*International Shipping Co. v. Hydra Offshore, Inc.,* 875 F.2d 388, 390 (2d Cir.), *cert. denied,* — U.S. ——, 110 S.Ct. 563, 107 L.Ed.2d 558 (1989).

■ Here, Investors did not file its summary judgment papers for any improper purpose; its motion was based on a good faith belief that it was entitled to indemnification from Dorinco pursuant to the Agreement. While Investors' reference to Dorinco's offer of judgment may have violated Fed.R.Civ.P. 68, which provides that unaccepted offers of judgment are inadmissible except in a proceeding to determine costs, this reference did not alter the fact that the summary judgment motion was itself based on a good faith claim under existing law. Because Investors' summary judgment motion was not interposed for any improper purpose, sanctions under Rule 11 were not appropriate. As with any evidentiary error, the proper remedy for Investors' action was simply to exclude the improper reference from the record.

Dorinco relies on *Hollingsworth Solderless Terminal Co. v. Turley,* 622 F.2d 1324 (9th Cir.1980), and *Chan Wing Cheung v. Hamilton,* 298 F.2d 459 (1st Cir.1962), for the proposition that "[i]nclusion of inadmissible information ... in a motion for summary judgment ... must constitute a per se violation of Rule 11." Brief for Appellee at 49. However, both of these cases simply stand for the proposition that "only admissible evidence may properly be considered by a trial court in granting summary judgment." 622 F.2d at 1335 n. 9; *see also* 298 F.2d at 460. Neither case has anything at all to do with the issue of Rule 11 sanctions.

The judgments of the district court are affirmed.

---

**5.** Investors also argues that the district court's judgment should be reversed because the court erroneously stated that "Dorinco indemnified Investors for the diminution of the Dorinco Syndicate's Initial Deposit," a fact unsupported by the statements submitted by the parties pursuant to local rule 3(g). Although this statement appears to be incorrect, the district court never relied on this fact in reaching its decision. The statement therefore provides no basis for reversing the district court's judgment. In all probability the sentence in context was intended by the judge to read, "Investors asked Dorinco to indemnify Investors for the diminution of the Dorinco Syndicate's Initial Deposit."